IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED
06 OCT 19 AM 10: 33
CLERK-LAS CRUCES

NINFA S. GORENA,

   Plaintiff,

v.                                         CV 05-0870 WPL/LAM

BOEING-SVS, INC.,

   Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING BOEING-SVS'S MOTION FOR SUMMARY JUDGMENT

Ninfa Gorena was employed in the finance department of Boeing-SVS, Inc. (SVS) in Albuquerque. Gorena sued SVS for national origin discrimination and retaliation, claiming that she was subject to a hostile work environment, and was subsequently laid off, because she is Hispanic and because she complained about the statements and actions of her supervisor, Nancy Jackson. Gorena also claimed that SVS violated an implied employment term that restricted SVS's ability to terminate her position.

SVS filed a Motion for Summary Judgment, seeking judgment as a matter of law on all claims asserted by Gorena. (Doc. 43.) I have reviewed the briefs submitted by the parties, and will grant SVS's Motion. SVS is entitled to summary judgment on Gorena's Title VII claims because she failed to timely sue SVS. In addition, Gorena has failed to establish a prima facie case that SVS discriminated against her based on ethnic animus or retaliated against her for opposing her supervisor's comments or actions. Finally, SVS is entitled to summary judgment on Gorena's implied employment contract claim because the SVS policy does not apply to the elimination of a



single position.

## Factual Background

In 1997 Gorena was hired by The Boeing Company (Boeing) to work as a Manufacturing Planner assigned to the Boeing 737 program in Seattle, Washington. Gorena held this position until 2001, when she became an Application Analyst for Boeing. In 2003, Boeing laid off Gorena and the members of her work group.

Before her layoff became effective, Gorena applied for the position of Application Analyst, Finance Systems, Level 2 (Analyst 2) at SVS in Albuquerque. SVS is a professional engineering firm and a wholly owned subsidiary of Boeing. Barbara Manzanares, the manager of SVS's accounting department, interviewed Gorena by video conference for this position. Also present during the interview were Nancy Jackson and two other SVS employees. Gorena claims that Jackson made an ethnically insensitive comment during the interview. During the interview Gorena was asked a question about workplace diversity. Gorena stated that she would feel comfortable in a diverse environment because she is "half Mexican and half Mescalero Indian." Jackson responded by stating that "I would not tell anyone that you are Mexican." (Doc. 45 at 5-6.) Gorena did not complain about the statement during the interview, and did not mention it to anyone at SVS until after SVS told her she would be laid off, more than one year later.

In April of 2003 Gorena began work as an Analyst 2 in the finance department of SVS. Gorena's job duties focused primarily on labor accounting issues, and in 2003 SVS used a software program called Costpoint Financial System to support its labor accounting requirements. During late 2003, SVS made plans to change its labor accounting software from Costpoint to IFMS, a different software program that was used by other Boeing-owned facilities. On April 26, 2004 SVS advised

2

Gorena that she would be laid off in sixty days, explaining to Gorena that, due to the conversion from Costpoint to IFMS, her Analyst 2 position had been eliminated and a new Analyst 3 position had been created.[1] SVS subsequently hired JoEllen Roberts, a white woman, for this position.

Gorena claims that Jackson, her "technical lead" at SVS, created a hostile work environment for her and that SVS laid her off in retaliation for complaining about Jackson's statements and conduct. Gorena claims that Jackson told her to call her "Nazi Nancy" and told Gorena that she should be afraid of her. Other people at SVS called Jackson a "time card Nazi," and Jackson at one "all hands meeting" referred to herself as "Nazi Nancy." Gorena also complains that Jackson was condescending to her and continually changed her job requirements.

Gorena filed a Charge of Discrimination against SVS on January 18, 2005, and received a right-to-sue letter from the Equal Employment Opportunity Commission on May 18, 2005. On August 16, 2005 Gorena filed suit against Boeing, claiming that Boeing discriminated and retaliated against her in violation of Title VII and 42 U.S.C. § 1981, and was also liable for breach of contract. On June 8, 2006, Gorena filed an amended complaint, which dropped all claims against Boeing and asserted her causes of action against SVS.

## GORENA'S TITLE VII CLAIMS ARE TIME-BARRED

SVS argues that Gorena did not comply with the ninety-day deadline to file suit against SVS and asserts that Gorena's claims are time-barred. Gorena admits that she did not sue SVS within ninety days of her receipt of the right-to-sue letter, but submits that her claims are not time-barred because of equitable tolling or because the claims in her amended complaint relate back to her

---

[1] Although the parties expend much energy arguing whether Gorena's job performance was substandard, it is undisputed that Gorena was not terminated for poor performance.

3

original complaint under Rule 15(c).

### *Equitable Tolling*

The requirement that a plaintiff file a timely civil action after the disposition of an EEOC complaint is not jurisdictional, but rather is subject to equitable tolling. *Jarrett v. US Sprint Commc'n Co.*, 22 F.3d 256, 259-60 (10th Cir. 1994). Gorena asserts that equitable tolling should apply because (a) her claim against SVS arises out of the same factual set of circumstances pled against Boeing, (b) SVS was aware of the action and was aware that SVS was not authorized to conduct business in the State of New Mexico when the Complaint was filed, and (c) Gorena reasonably believed that Boeing was the appropriate entity to sue.

Gorena has not claimed that SVS or Boeing made any false representations that caused her to sue the wrong entity. The Tenth Circuit has held that Title VII time limits will be tolled only where the circumstances of a case rise to a level of "active deception" sufficient to invoke the powers of equity. *Simons v. Southwest Petro-Chem, Inc.*, 28 F.3d 1029, 1031 (10th Cir. 1994); *Johnson v. United States Postal Serv.*, 861 F.2d 1475, 1480-81 (10th Cir. 1988). The Tenth Circuit takes a strict view of what necessitates equitable tolling, finding that equitable tolling may be appropriate only where a plaintiff has been "lulled into inaction by her past employer," "actively misled," or "has in some extraordinary way been prevented from asserting" her rights. *Johnson*, 861 F.2d at 1480-81 (quoting *Martinez v. Orr*, 738 F.2d 1107, 1110 (10th Cir. 1984)). Gorena has failed to meet the high standards required in this Circuit to invoke equitable tolling.

### *Rule 15 Relation Back*

Gorena next argues that her Title VII claims are not time-barred because her amended complaint "relates back" to her original complaint. An amended complaint that changes the

4

defendant or the naming of the defendant relates back to the date of the original complaint when the claim asserted in the amended complaint arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original complaint and, within the period provided by Rule 4(m) for service of the summons and complaint, the defendant to be brought in by amendment "(A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." FED. R. CIV. P. 15(c)(3). SVS argues that Gorena cannot prove that she made a "mistake concerning the identity of the proper party," because she knew before she accepted employment with SVS that SVS is a subsidiary corporation of Boeing.

The term "mistake" has been the source of considerable conflict among the courts. Some courts have taken a very broad view of what constitutes a "mistake." The First Circuit has held that "every mistake involves an element of negligence, carelessness, or fault," and that Rule 15(c)(3) does not distinguish among types of mistakes concerning identity. *Leonard v. Parry*, 219 F.3d 25, 29 (1st Cir. 2000). The First Circuit concluded that Rule 15(c)(3) "encompasses both mistakes that were easily avoidable and those that were serendipitous." *Id.* Other courts have focused on whether the added defendant knew or should have known that the action would have been filed against it but for the plaintiff's mistake, and have eschewed consideration of whether the plaintiff's mistake was reasonable. *See, e.g., Graham v. Gendex Med. X-Ray, Inc.*, 176 F.R.D. 288, 290-91 (N.D. Ill. 1997); *Pan v. Bane*, 141 P.3d 555, 563 (Okla. 2006) (quoting 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 15.19[3][d], at 15-92 (3d ed. 1999)). Under this analysis, a "mistake" has occurred for Rule 15(c)(3) purposes where the plaintiff intended to sue the proper party but

5

misidentified or misnamed him in the original complaint and the new party knew within the proper time period that he would have been sued but for the mistake. *Pan.* 141 P.3d at 563.

Other courts have taken a narrower view of what qualifies as a "mistake" under the rule. Under the narrower view, there is no mistake of identity under Rule 15(c)(3) where the plaintiff was aware of the possible defendants and merely chose the wrong party to sue. *Rendall-Speranza v. Nassim*, 107 F.3d 913, 917-19 (D.C. Cir. 1997); *Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir. 1994). Further, some courts have emphasized that the mistake requirement is independent of whether the added defendant knew or should have known that the action would be brought against him. *See, e.g., King v. One Unknown Fed. Corr. Officer*, 201 F.3d 910, 914 (7th Cir. 2000).

The Tenth Circuit appears to take the narrow view of what constitutes a "mistake" under Rule 15(c)(3). Although a party may correct a misnomer of a defendant, suing a party deliberately, but mistakenly, does not constitute a misnomer. *See Archuleta v. Duffy's Inc.*, 471 F.2d 33, 35 (10th Cir. 1973); *Graves v. Gen. Ins. Corp.*, 412 F.2d 583, 584-85 (10th Cir. 1969). The Advisory Committee Notes to Rule 15(c)(3) indicate that the mistake proviso was included in order "to resolve 'the problem of a misnamed defendant' and allow a party 'to correct a formal defect such as a misnomer or misidentification.'" *Garrett v. Fleming*, 362 F.3d 692, 696-97 (10th Cir. 2004) (quoting *Wayne v. Jarvis*, 197 F.3d 1098, 1103 (11th Cir. 1999)). Thus, the rule allows an amendment changing the name of a defendant to relate back to the original complaint only if the change is the result of such a formal defect. *Id.* at 697.

In support of her decision to sue Boeing, Gorena asserts that, when she filed suit, SVS was not legally registered with the New Mexico Public Regulation Commission to transact business in New Mexico, while Boeing was. Gorena also relies upon the fact that all of her paychecks, benefits

6

information, insurance and other employment information came from Boeing.[2] Gorena readily admitted on deposition, however, that she knew that SVS was a subsidiary corporation of Boeing before she began work at SVS. Gorena cites cases to show an identity of interest between Boeing and SVS, but those cases address the issue of whether SVS had timely notice of the action such that it would not be prejudiced in maintaining a defense to the action, and do not address the "mistake" component. *Pan*, 141 P.3d at 560-62.

Claims similar to Gorena's were rejected by the Tenth Circuit in *Archuleta*. Archuleta filed a complaint with the EEOC alleging that his former employer, Duffy's Inc., violated Title VII. 471 F.2d at 34. After receiving his right-to-sue letter, Archuleta filed suit in district court, naming as the defendant "Denver Pop Company, a Colorado corporation, formerly known as and d/b/a Duffy's Inc." *Id*. Archuleta named Denver Pop Company as the defendant based upon misinformation given by the Colorado Secretary of State. *Id*. n.2. The Tenth Circuit determined that Archuleta was not attempting to correct a misnomer, but was substituting parties, and found that Archuleta's amended complaint did not relate back because he had failed to comply with all the provisions of Rule 15(c). *Id*. at 35-36.

Since Gorena sued Boeing because SVS was not registered to do business in New Mexico, Gorena was aware of the possible defendants and chose the wrong party to sue. Accordingly, Gorena did not sue Boeing by mistake, and her amended complaint does not relate back to her original complaint to avoid the statute of limitations.

---

[2] However, the pay stub Gorena attached as Exhibit 5 was received while she worked for Boeing in Seattle, not during the term of her employment with SVS.

7

## GORENA'S CLAIMS OF DISCRIMINATION PRIOR TO MARCH 24, 2004 ARE BARRED

Title VII requires Gorena to file her charge of discrimination within 300 days of the allegedly discriminatory act. 42 U.S.C. § 2000e-5(e)(1); *Duncan v. Manager, Dep't of Safety*, 397 F.3d 1300, 1308 (10th Cir. 2005). Gorena filed her charge of discrimination with the EEOC on January 18, 2005. SVS asserts, and Gorena agrees, that all claims for discrimination for actions taken by SVS prior to March 24, 2004 are barred as a result of the running of the statute of limitations.

## GORENA'S DISCRIMINATION CLAIMS

Even if Gorena's claims were not time-barred, they fail on the merits. Gorena alleges that she was discriminated against because of her national origin. Specifically, she claims that she was subjected to a hostile work environment, and was subsequently laid off, because she is Hispanic.

### *Hostile Work Environment Claim*

The Tenth Circuit has long recognized that a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to Title VII. *Bolden v. PRC Inc.*, 43 F.3d 545, 550 (10th Cir. 1995); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412-13 (10th Cir. 1987). To constitute actionable harassment, Gorena must establish that the conduct was sufficiently severe or pervasive enough to alter the conditions of her employment and create an abusive working environment. *Bolden*, 43 F.3d at 550-51. In deciding whether or not a hostile environment existed, it is necessary to look to all the circumstances involved in the situation, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nieto v. Kapoor*, 268 F.3d 1208, 1218 (10th Cir. 2001) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993)).

Gorena claims that Jackson created a hostile work environment for her. She alleges that, in addition to the ethnically insensitive comment Jackson made during the video interview, Jackson told her to call her "Nazi Nancy" and told Gorena that she should be afraid of her. Gorena also complains that Jackson was condescending to her, belittled her, and continually changed her job requirements.

Although Gorena claims that "Jackson directly told Plaintiff to call her 'Nazi Nancy,'" (Doc. 45 at 5), Gorena failed to cite any evidence in support of this claim. I have carefully reviewed the deposition testimony submitted by the parties on this issue, and can find no evidence to support Gorena's claim.[3] It is Gorena's burden to properly support her allegations in response to SVS's Motion for Summary Judgment. *See* D.N.M.LR-Civ 56.1(b); *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 & n.6 (10th Cir. 2000). There is evidence to support Gorena's claims that other people at SVS called Jackson a "time card Nazi," and that Jackson at one meeting referred to herself as "Nazi Nancy."

Jackson's statements and conduct were not pervasive or severe enough to alter the conditions of Gorena's employment and create an abusive working environment. Considering all of the circumstances in light of Jackson's statement during the job interview that does reflect ethnic bias, Gorena has failed to show "more than a few isolated incidents" of ethnic enmity. *Hicks*, 833 F.2d at 1412. General harassment that is not racial or sexual is not actionable. *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (holding that judicial standards for sexual harassment must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive

---

[3] I have also reviewed and considered Exhibit 25 to the Barbara Manzanares deposition, which Gorena did not file as part of the summary judgment record. See *infra* at 11-12.

9

language, gender-related jokes, and occasional teasing") (internal quotation marks omitted); *Bolden*, 43 F.3d at 551. Although Jackson may have been condescending and may have belittled Gorena, Gorena has failed to demonstrate that such actions were due to her national origin. SVS is entitled to summary judgment on Gorena's hostile work environment claim.

### *Discriminatory Layoff Claim*

Gorena has the initial burden of establishing a prima facie case of wrongful discharge. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000). Only if she satisfied this burden would the burden shift to SVS to articulate some legitimate, nondiscriminatory reason for her discharge. *Id.*

To establish a prima facie case that she was wrongfully discharged, Gorena must show that (1) she belonged to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was laid off; and (4) her job was not eliminated after her layoff. *Id.* at 1229. For purposes of its Motion, SVS concedes that Gorena can satisfy the first three elements, but contends that the evidence is undisputed that Gorena's Analyst 2 position was eliminated as a result of the transition to IFMS and that the Analyst 3 position that was subsequently filled has different job duties and responsibilities than the Analyst 2 position.

Gorena asserts that comparing the Job Requisition for the Analyst 3 position with her job duties at the time she was fired shows that SVS replaced her under the guise of creating a new, different position. The testimony by the parties demonstrates otherwise. Barbara Manzanares, manager of the accounting department, testified that most of Gorena's duties were eliminated when SVS changed its software from Costpoint to IFMS. In addition, SVS determined that Nancy Jackson should devote 100% of her time to work on the conversion and realignment from Costpoint to IFMS.

SVS created a new Analyst 3 position that would assume Jackson's prior job responsibilities and the remaining duty of Gorena's Analyst 2 position. Manzanares also testified that the Analyst 3 position required more independent thinking and advanced technical knowledge than the Analyst 2 position. Gorena admitted that the requisition for the Analyst 3 position included not only the tasks that she performed, but also " a lot more" tasks than she was doing. (Doc. 44 Ex. A at 319.) Therefore, SVS is entitled to summary judgment on this issue because Gorena has failed to make out a prima facie case that her job was not eliminated after her layoff.

## GORENA'S RETALIATION CLAIMS

As with her wrongful discharge claim, Gorena has the initial burden of establishing a prima facie case of retaliation. *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). She alleges that SVS retaliated against her for reporting Jackson's statements and conduct by terminating her employment. To establish a prima facie case of retaliation, Gorena must show that: (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. *Id.*; *see also Burlington N. & Santa Fe Ry. Co. v. White*, --- U.S. ----, 126 S.Ct. 2405, 2414-15 (2006).

Gorena cannot establish a prima facie case of retaliation because she did not engage in protected activity. First, Gorena cannot assert that she was retaliated against for reporting the discriminatory remark that Jackson made during the video job interview because Gorena did not complain about that statement until after she was told she would be laid off. Second, although Gorena asserts that she complained to her manager about the remarks made by Jackson and the hostile work environment created by Jackson, she has failed to properly support these assertions.

Although Gorena refers to Exhibits 25 and 26 to the deposition of Barbara Manzanares, she did not quote from these documents and failed to file the Exhibits as part of the summary judgment record. FED. R. CIV. P. 56(c) (court reviews matters on file); FED. R. CIV. P. 5(d) (discovery materials are not filed until they are used in a court proceeding).

Although Gorena did not file Exhibits 25 and 26, she mailed them to me, and I will attach these Exhibits to this Order. In Exhibit 25, Gorena states:

> [I]t upsets me that Nancy calls herself Nazi Nancy, enjoys calling herself that, and acts in a gestapo mentality in which I feel I have to defend myself on a daily basis. Nancy can be condescending and I struggle to reach her expectations.

Even if I consider Exhibit 25, Gorena has not established that she complained about national origin discrimination. Rather, Gorena complained to Manzanares about the normal "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 126 S. Ct. at 2415. Title VII "does not set forth a general civility code for the American workplace." *Id.* (internal quotation marks omitted). Because Gorena did not oppose an unlawful employment practice, SVS is entitled to summary judgment on this claim. *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188-89 (10th Cir. 2002).

Further, Gorena has failed to produce evidence of a causal connection between her complaints and SVS's decision to lay her off. A causal connection may be shown by circumstances that justify an inference of retaliatory motive, such as protected conduct followed by an adverse employment action. *Martinez v. Henderson*, 252 F. Supp. 2d 1226, 1238-39 (D.N.M. 2002), *aff'd*, 347 F.3d 1208 (10th Cir. 2003). The Tenth Circuit has held that a one-and-one-half-month period between protected activity and adverse action may, by itself, establish causation, while a three-month period, standing alone, is insufficient to do so. *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253

(10th Cir. 2001). Assuming that Gorena complained about Jackson's statements and behaviors during the December 2003 performance evaluation, she was not informed of her layoff until April 26, 2004, more than four months later. Gorena's conjecture that her lay off was retaliatory is not sufficient to establish a prima facie case of retaliation. *See Miller v. Auto. Club of N.M.*, 420 F.3d 1098, 1122 (10th Cir. 2005).

## GORENA'S SECTION 1981 CLAIMS

The same analytical framework for Gorena's Title VII claims is applicable to her claims brought under § 1981. *Maldonado v. City of Altus*, 433 F.3d 1294, 1307 (10th Cir. 2006). Therefore, Gorena's § 1981 claims fail on the merits for the same reasons that her Title VII claims fail.

## GORENA'S BREACH OF CONTRACT CLAIMS

Gorena claims that SVS had a written policy titled Layoff Selection Process (LSP) that governed lay offs from SVS, and that SVS failed to comply with this policy when she was laid off. Gorena claims that, under New Mexico law, the LSP created an implied employment contract that modified her status as an "at-will" employee.

Under the LSP, an SVS Skills Management Team/Functional Management (Team) defines a layoff assessment group, which is composed of employees with the same or similar skills and job levels, who work within the same key responsibility areas, "wherein the employees may be considered interchangeable." (Doc. 45 Ex. 11 at 3-4.) The Team determines the key responsibility areas, the competencies (*i.e.*, knowledge, skills and abilities), and the competency weightings against which the employees in the layoff assessment group will be assessed. The Team completes Individual Assessments forms for each employee, and the "[e]mployees with the lowest point totals may be subject to layoff notification." (*Id.* at 5.) The Team must then complete a Layoff Decision

Narrative Form, which describes the reasons for layoff selection, and the LSP Forms and Narrative must be approved by Human Resources prior to issuing an advance notification of layoff letter.

In New Mexico, an employee is presumed to be an at-will employee in the absence of an express or implied contract and may be discharged at any time. *Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 779 (N.M. 1993). One exception to the rule of at-will employment is the existence of an implied contract that restricts the employer's power to discharge. *Id.* "An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Id.* at 783. There are two reasons that support entry of summary judgment for SVS on this issue.

First, although Gorena has provided a copy of the LSP, she has failed to cite any evidence that she received it while she was employed at SVS. Gorena could not have a reasonable expectation that SVS would follow the LSP if she was not aware of the LSP. *Id.* at 784 (suggesting that a party must establish receipt of a handbook containing a disclaimer for the disclaimer to apply).

Second, assuming that Gorena received the LSP during her employment, the LSP, by its own terms, only applies to lay offs of employees with similar job skills and levels who may be considered interchangeable. This means that the LSP only applies to lay offs that involve the consideration of groups of employees, not to the elimination of a single position.

## CONCLUSION

Gorena has failed to create a fact issue that would support the submission of any of her theories of recovery to the jury. Accordingly, it is ordered that SVS's Motion for Summary Judgment is hereby granted, Gorena's Amended Complaint against SVS is dismissed with prejudice, and SVS

is entitled to recover its allowable costs.

*William P. Lynch* (signature)
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

15

# BOEING — PERFORMANCE EVALUATION WORKSHEET

| EMPLOYEE NAME (Last, First, MI) | BEMS I.D. |
|---|---|
| Gorena, Ninfa S | 349691 |

| JOB TITLE | PROGRAM |
|---|---|
| Applications analyst | |

| REVIEW PERIOD | BUDGET/DEPT NO. |
|---|---|
| 4/4/2003 - 12/31/03 | 838 |

| BUSINESS GOALS AND OBJECTIVES | MANAGER/EMPLOYEE COMMENTS |
|---|---|
| ~~Own~~ Take responsibility of guardianship in the labor processing.<br><br>Conduct internal audits (ETS & Floor Checks), weekly reporting, new hire orientation, ETS training.<br><br>Become familiar with Costpoint modules; become a resource for Costpoint technical support.<br><br>Increase technical database knowledge. | Manager Comments Mechanics are complete – know terms  short labor exempt, non-exempt.  Can communicate essentials of ETS. make it your own; renew floorcheck audits.  Continue to understand labor module; increase understanding of projects Relationships of queries, purpose of each<br><br>Employee Comments: <u>With the exception of restrictions and limitations by lead</u> I will do my part to increase all skill sets required. Including but not limited to labor processing, weekly reporting, increasing technical knowledge base, communications and working in partnership BSVS and Canoga Park. |

## PERFORMANCE CONTINUUM

| PERFORMANCE VALUES | Did not meet expectations | Met most expectations | Met all expectations | Frequently exceeded expectations | Always exceeded expectations |
|---|---|---|---|---|---|
| **Problem Solving (Judgment)** - Interprets data from various sources; generates effective solutions to problems; makes sound business decisions; generates alternative approaches to problem solving; demonstrates awareness of consequences or implications of judgments. | | | | X | |
| **Communication** – Listens and demonstrates understanding; clarifies meaning for others; speaks with clarity and precision; able to communicate with a diverse audience; writes clearly and concisely | | | | X | |
| **Technical Skills & Knowledge** - Applies knowledge, skills, and mastery of job processes to achieve results; expertise is recognized and sought by others; continuously develops and advances technical capabilities. | | | X | | |
| **Integrity** - Deals with others in a fair, honest, and straightforward manner; honors commitments; is trustworthy; takes responsibility for failures and shares credit for successes; uses appropriate discretion and is sensitive to confidentiality; demonstrates high ethical standards. | | | | X | |
| **Quality & Productivity** - Delivers products and services that consistently meet or exceed expectations with little or no rework required; uses metrics and tools to manage quality and identify root causes; strives for continuous quality improvements; uses time and resources effectively; produces value-added contributions; strives for more efficient work processes. | | | X | | |
| **Customer Satisfaction** - Builds long-term relationships with customers; understands customers' current and future needs; meets customer commitments and keeps customers informed; seeks and uses customer feedback. | | | X | | |

F710000042 NEW (14 FEB 2002)                               BOEING LIMITED



EXHIBIT 25
Manzanares

...ly reports for program cost and contract management.

*Expectations at appraisal date:*
Be able to independently resolve issues during labor processing and understand why
Understand all queries used in labor process and know purpose.

*Expectations for next 3 to 6 months:*
Develop analytical skills to be able to review labor data to know if it looks reasonable.
Assume full ~~responsibility~~ guardianship of reports to include questions from users.
Take intermediate Access class; this should pave the way for complete understanding of all Access queries.
Continue to gain knowledge ~~and establish a positive working relationship with lead - be open and honest.~~

Barb, I will never be able to accomplish this statement. No matter what I do, how hard I work at it, how open, honest and positive I can be, it will never be good enough with Nancy. As we discussed earlier, it upsets me that Nancy calls herself Nazi Nancy, enjoys calling herself that, and acts in a gestapo mentality in which I feel I have to defend myself on a daily basis. Nancy can be condescending and I struggle to reach her expectations. I do not believe I ever try or treat people with a negative attitude. I *always* live by my motto, which is, I wouldn't ever ask you to do anything I wouldn't do myself and life is too short not to get along. I believe I treat people fairly with compassion, respect and dignity, as I have with Nancy. So it should go without saying actions speak louder then words. Now, if only I can get the same treatment from Nancy we would be lean, mean, well oiled labor processing machine.

## OVERALL PERFORMANCE SUMMARY

| Did not meet expectations | Met most expectations | Met all expectations | Frequently exceeded expectations | Always exceeded expectations |
|---|---|---|---|---|
| | | X | | |

### EMPLOYEE COMMENTS

*The first few months in this new position, I faced relocation anxiety which influenced my performance. I soon recognized that to move forward I needed to put the distractions behind me so I could focus my attention where they should be: within the systems of* CLP, RCA, ETS, Impromtu, ETS database and Costpoint labor modules) *that play a strong role in the accounting department in the coming year,* with the help of management. *I'm determined to increase my skill sets by seeking additional classes which will strengthen my knowledge base, coordinate with subject matter experts as much as possible, and will keep challenging myself to build on that foundation.*

## SIGNATURES

| EMPLOYEE'S SIGNATURE | DATE |
|---|---|
| | |
| REVIEWING MANAGEMENT'S SIGNATURE | DATE |
| | |
| ...IAL - REVIEWING MANAGEMENT'S SIGNATURE | DATE |
| | |

F7100000042 NEW (14 FEB 2002)    **BOEING LIMITED**

Gorena, Ninfa S

**From:** Manzanares, Barbara A
**Sent:** Wednesday, December 17, 2003 11:01 PM
**To:** Gorena, Ninfa S
**Subject:** RE: Reminder - Submit Performance Evaluation

Thanks for taking the time to comment; I can see you have put some thought in this. I made a few edit's..they are in this blue font.

We can finalize tomorrow.

Barb

*[handwritten note: Barb in reciept of PE Draft.]*

2003 perf
app_Gorena_BM.doc (!

-----Original Message-----
**From:** Gorena, Ninfa S
**Sent:** Wednesday, December 17, 2003 7:59 AM
**To:** Manzanares, Barbara A
**Subject:** RE: Reminder - Submit Performance Evaluation

Barb,
Enclosed is my performance appraisal. I have included my comments and suggested changes highlighted in red. Please, make your adjustments as necessary.
Thanks
Ninfa

<< File: 2003 perf app_Gorena.doc >>

-----Original Message-----
**From:** Manzanares, Barbara A
**Sent:** Tuesday, December 16, 2003 11:31 PM
**To:** Gorena, Ninfa S
**Subject:** Reminder

Ninfa - I really need your response/comments to the performance appraisal by Thursday if at all possible.

Thanks, Barb

*Barbara Manzanares*

